**AMERICAN HARDWARE MUTUAL INSURANCE COMPANY,**
Plaintiff-Appellant,

v.

**John P. MORAN, et al.,**
**Defendants-Appellees.**

No. 82–2275.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 29, 1982.

Decided April 11, 1983.

Alan L. Unikel, Fox & Grove, Chicago, Ill., for plaintiff-appellant.

Roger B. Harris, Altheimer & Gray, Chicago, Ill., for defendants-appellees.

Before CUMMINGS, Chief Judge, POSNER, Circuit Judge, and SWYGERT, Senior Circuit Judge.

CUMMINGS, Chief Judge.

This appeal considers whether a promise by an insurance salesman not to do business with insureds of his former employer is enforceable under Illinois law.

Plaintiff American Hardware Mutual Insurance Company ("American") is a Minnesota corporation in the business of selling package insurance plans to businesses. These plans cover a wide variety of risks— i.e., fire, casualty, sickness, injury, death, workers' compensation. The typical plan has a term of one year and may be terminated by the insured at any time at a cost of 10% of the remaining monthly premiums.

Defendant Moran is a former employee of American and an Illinois citizen. For five years, Moran was one of American's

---

sales representatives in a territory comprising five counties in northern Illinois. On January 31, 1982, Moran quit his position with American and began work as a sales representative for defendant Frank B. Hall & Co. of California ("Hall"), a competitor of American.[1] Moran had a written employment contract with American when he switched companies. That contract gives American the "exclusive right, title, and interest in and to * * * all records of [American's] insurance policies, * * * policy expiration dates, and the names, telephone numbers and addresses of existing or prospective policyholders" and requires that Moran surrender all such records to American upon termination of his employment. The contract also prohibits Moran from doing business in the same five county territory with any customers of American for a period of two years from the date he leaves American's employ. That period will expire February 1, 1984, according to American's counsel.

After consulting his new employer, Moran apparently decided to disregard these restrictions. Moran retained certain records from his days with American that reveal the names and addresses of businesses insured by American, the premiums each pays, the type of insurance policy each possesses, and the expiration date of each policy. Shortly after leaving American, Moran also began contacting on behalf of Hall some of the same businesses to which he had sold insurance while an employee of American. Because of Moran's sales efforts, some of American's insureds terminated or failed to renew their policies with American and purchased insurance from Hall.

Three months after Moran ended his employment with American, American commenced this diversity action for monetary and injunctive relief in federal district court. American charges, *inter alia,* that Moran's conduct after leaving its employ is a breach of his employment contract. American moved for a preliminary injunction barring Moran from attempting to sell package insurance plans to businesses that were customers of his when he was an employee of American. The district court denied that motion and American has appealed. For the reasons that follow, we affirm, 545 F.Supp. 192.

■ Admittedly Illinois law governs this diversity case. Illinois courts will not enforce a covenant by an employee not to compete with his employer except to protect some "legitimate business interest" of the employer. *Hydroaire, Inc. v. Sager,* 98 Ill.App.3d 758, 764–765, 53 Ill.Dec. 928, 424 N.E.2d 719 (1st Dist.1981), *quoting Image Supplies, Inc. v. Hilmert,* 71 Ill.App.3d 710, 712–713, 28 Ill.Dec. 86, 390 N.E.2d 68 (1st Dist.1979). See also *House of Vision, Inc. v. Hiyane,* 37 Ill.2d 32, 37–38, 225 N.E.2d 21 (1967). The district court denied American's preliminary injunction motion on the ground that it was unlikely that American would be able to prove that it had a legitimate business interest in preventing one of its former employees from enticing away some of its customers. American claims that the district court abused its discretion in making that determination. American claims that preventing Moran from inducing its insureds to discontinue their policies will protect three business interests it has and that each of these interests is entitled to protection under Illinois law.

First, American claims that it expended considerable resources training Moran when it first hired him and that it has a legitimate interest in recouping those resources. American argues that the only way it can do this is to prevent Moran from taking some of its customers with him upon his leaving its employ. We doubt that this is so. American could probably recoup whatever it spends to train its salesmen—if it does not already do so—simply by paying them a lower base salary or rate of commission or by requiring that they pay out of pocket for the cost of their training. It appears that there is nothing secret about the skills American teaches its novice salesmen. That salesmen do not covenant not to

1. Hall sells package insurance plans to automo- bile, truck, and motorcycle dealers.

compete with American until after all of their classroom training is complete is some indication of this. The skills taught are commonly possessed by experienced salesmen throughout the industry so that there is no reason to suppose that employees could not afford to pay for their training out of the income they earn while employed by American. See P. Rubin & P. Shedd, *Human Capital and Covenants Not To Compete,* 10 J. Legal Stud. 93 (1981). But American might not want to recoup its investment in its employees by paying them a lower salary or a lower rate of commission. Salesmen might prefer foregoing the chance to do business with American's insureds on their own or for another insurer sometime in the future rather than receiving a lower salary or commission, perhaps because a dollar in hand is worth more to them than the chance to earn more than a dollar sometime in the future. And American might prefer to pay its salesmen higher salaries and commission rates than to run the risk of losing business when salesmen quit, perhaps because the premiums its insureds pay are worth more to it than to its salesmen. Thus American might be able to pay its salesmen more if it can prevent them from competing for its customers when they leave its employ.

This suggests that American's professed interest in recouping its training costs derives from its interest in hiring good salesmen. The amount of good will between purchasers and salesmen, or the cost of training salesmen, might be less in other markets than in the market for package insurance plans. If no-compete covenants by American's employees are not enforced, American might be forced to pay its salesmen less than other firms pay their salesmen. If so, the quality of salesmen American is able to hire might decrease.

It would seem to follow that a firm should be free to compete with other firms for good employees by preventing its former employees from competing with it provided the firm, as here, is not a monopolist in the market in which the employee is prohibited from competing. Only when a firm enjoys monopoly power is there any

danger that enforcing an employee's covenant not to compete will injure the public by requiring it to pay more for the firm's product. The market in northern Illinois for package insurance plans for automobile, truck, and motorcycle dealers is apparently very competitive—in fact, American's market share appears to be dwindling, so that there is probably no danger that enforcing Moran's covenant will have any effect upon the market price of the package insurance plans American sells. Thus one might suppose that American should not be required to pay Moran more than it agreed to when it hired him, that is, it should not be required to pay him the value in insurance premiums of the good will he built up with his customers while employed by American.

Unfortunately, Illinois law requires otherwise. A firm's interest in attracting well-qualified employees is not a "legitimate business interest" entitled to protection under Illinois law. *House of Vision, Inc. v. Hiyane,* 37 Ill.2d 32, 225 N.E.2d 21 (1967); *Iroquois Industries Corp. v. Popik,* 91 Ill.App.3d 505, 47 Ill.Dec. 279, 415 N.E.2d 4 (1st Dist.1980). Illinois courts will enforce an employee's covenant not to compete only to protect either the good will of a firm's business, *Canfield v. Spear,* 44 Ill.2d 49, 254 N.E.2d 433 (1969); *Wessel Co., Inc. v. Busa,* 28 Ill.App.3d 686, 329 N.E.2d 414 (1st Dist.1975), or the confidentiality of information valuable to the firm's business. *Donald McElroy, Inc. v. Delaney,* 72 Ill. App.3d 285, 27 Ill.Dec. 892, 389 N.E.2d 1300 (1st Dist.1979); *Wessel Co., Inc. v. Busa, supra.* The rationale appears to be that unless a covenant not to compete serves one of these two interests, the hardship upon employees and the public of enforcing it necessarily outweighs any benefit to the employer. See *House of Vision, supra* 37 Ill.2d at 37, 225 N.E.2d 21; *Hydroaire, Inc. v. Sager,* 98 Ill.App.3d 758, 765, 53 Ill.Dec. 928, 424 N.E.2d 719 (1st Dist.1981); *Image Supplies, Inc. v. Hilmert,* 71 Ill.App.3d 710, 715, 28 Ill.Dec. 86, 390 N.E.2d 68 (1st Dist. 1979). American's interest in attracting good salesmen is therefore not ground under Illinois law for preliminarily enjoining

Moran from doing business with its insureds.

American argues, second, that it has an interest in seeing that its insureds do not terminate their insurance contracts and that many of them will terminate their contracts unless Moran is prevented from urging them to buy insurance from Hall. Illinois law protects a seller's business relations with its customers only when those relations are of long standing. *Nationwide Advertising Service, Inc. v. Kolar,* 14 Ill. App.3d 522, 302 N.E.2d 734 (1st Dist.1973). Long-standing customer relations indicate that a business has acquired good will. Protecting that good will against appropriation by former employees increases the value of the business as a going concern and thus attracts entry into the market and encourages long-term investments of the sort likely to generate repeat business.

From the record before us, it seems that American's business has no good will. The district court found that American's customers are extremely price-sensitive. That finding is not contradicted by anything in the record. There is nothing to indicate that its customers are loyal and of long standing. American has made no showing, for example, that a significant percentage of its contracts are renewed each year. Accordingly it does not appear likely that the value of American as a going concern will suffer if former employees are permitted to solicit business from American's insureds.

American argues that its relations with its insureds are entitled to greater protection than ordinary customer-seller relations because its insureds are under contract. Although certain types of contractual relations are entitled to protection under Illinois law, see *J.D. Marshall International, Inc. v. Fradkin,* 87 Ill.App.3d 118, 42 Ill.Dec. 509, 409 N.E.2d 4 (1st Dist.1980), American's relations with its insureds are not such a type. American's insurance contracts have a one-year term and are terminable at will by the insured. As pointed out earlier, an insured may switch insurers before his contract expires by paying American a fee equal to ten percent of the premiums outstanding. This fee may make American's insureds a little more reluctant to terminate their contracts than to fail to renew them, but it is no reason to afford American's relations with insureds whose contracts are not yet up for renewal greater protection than its relations with those insureds whose contracts are up for renewal.

Third, and lastly, American claims it has a protectible interest in preventing former employees from appropriating confidential information about its insureds. When Moran left American, he took with him records that reveal the names of American's insureds, the premiums each pays, the type of coverage each has, and the date each policy is up for renewal. American claims that all of that information is confidential and that to protect it Moran should be prohibited from doing business with customers he dealt with when he was one of its employees.

Illinois courts will enforce an employee's covenant not to compete to prevent an employee from using for his own benefit confidential information he acquired from his employer in the course of his employment. *Armour & Co. v. United American Food Processors, Inc.,* 37 Ill.App.3d 132, 345 N.E.2d 795 (1st Dist.1976). Preventing employees from appropriating information their employer has expended resources to acquire is a way of stimulating the production of information. Firms, for example, will invest more resources in research if their competitors are prevented from cashing in on their discoveries. In addition, if the law forbids employees from appropriating valuable information they acquire from their employer, then an employer that possesses a valuable piece of information need not waste its resources keeping the information secret from its employees. The firm that discovers how to cut production costs by ten percent, for example, need not worry how to implement its discovery without disclosing it to its employees.

Preventing insurance salesmen from appropriating the kind of information Moran took with him when he left American would neither encourage insurance companies to

produce more of that kind of information nor lessen the amount insurance companies spend to keep that information from their employees. See *Iroquois Industries Corp. v. Popik,* 91 Ill.App.3d 505, 508, 47 Ill.Dec. 279, 415 N.E.2d 4 (1st Dist.1980); *Image Supplies, Inc. v. Hilmert,* 71 Ill.App.3d 710, 713, 28 Ill.Dec. 86, 390 N.E.2d 68 (1st Dist.1979); *McCormick v. Empire Accounts Service, Inc.,* 49 Ill.App.3d 415, 419, 7 Ill.Dec. 259, 364 N.E.2d 420 (1st Dist.1977). American acquires the information it claims is confidential whenever it sells an insurance policy. As soon as it sells a customer insurance, it knows the name of that customer, the premiums it agreed to pay, the type of coverage it has, and the renewal date of the policy. American is not likely to be less willing to sell insurance policies if the law does not prevent its competitors—such as Hall—from acquiring that information from its former employees. Compiling the information in one set of records—American calls the records containing the contested information "production reports"—required it to expend some resources, but American is not likely to stop compiling such information if it is not judicially protected. Keeping good records of its accounts is the best available means for American to put information about its customers to good use.

There is little point in American's expending any resources to protect this information because its competitors can easily acquire it on their own. All of the evidence before the district court indicates that customers in the relevant market—automobile, truck, and motorcycle dealers—may be easily identified by perusing the yellow pages of a telephone directory and that they are almost always more than willing to reveal their current coverage and premiums in the hope of finding a better deal. True, knowing when a policy is up for renewal enables one to identify in advance those customers most likely to switch insurers—the closer a policy is to renewal the less the insured must forfeit to switch insurers—but American is not likely to spend much money just to put its competitors through the trouble of calling one of its insureds and asking when his policy expires. Moreover, it is dubious whether American could do anything to keep this kind of information from its employees. American seeks to enjoin Moran from doing business with the very customers to whom he sold insurance while he was one of its salesmen. There is probably nothing American can do to keep its employees from maintaining private records revealing to whom they sell insurance and when that insurance is up for renewal.

On the basis of Illinois law, we affirm the district court's order denying plaintiff's motion for a preliminary injunction.

SWYGERT, Senior Circuit Judge, concurring in the result.

I would affirm on the basis of the Illinois cases cited by Chief Judge Cummings in his opinion and, further, for the reasons given by District Judge Shadur in his memorandum opinion.